# PSYCHIATRIC AFFILIATES, P.A.

2300 MAITLAND CENTER PARKWAY, SUITE 211
MAITLAND, FLORIDA 32751
⚜
(407) 679-6400   FAX (407) 679-7988

**JEFFREY A. DANZIGER, M.D.**
*Diplomate, American Board of Psychiatry and Neurology*
*Forensic, Geriatric and Addiction Psychiatry*

**SUSAN M. SKOLLY-DANZIGER, PHARM.D., MS**
*Diplomate, American Board of Applied Toxicology*
*Forensic Toxicology*

October 29, 2025

Bjorn Brunvand, Esq.
Brunvand & Wise Law Group
615 Turner St
Clearwater, FL 33756

RE:   United States of America v. Robert Bouton McDougal
       Case Number: 8:24-cr-312-VMC-SPF


Dear Mr. Brunvand,

1. Pursuant to your request, I conducted a psychiatric evaluation of your client, Robert McDougal. Mr. McDougal is a 29-year-old white man, facing federal charges of one count of stalking and three counts of threat to injure. My interview with the defendant took place on October 1, 2025, at the Pinellas County Jail in Clearwater, Florida. The interview began at 12:25 PM, and concluded at 2:20 PM.

2. I was asked to offer opinions as to psychiatric diagnosis, treatment recommendations, and whether there any potential mitigating factors worthy of consideration by the Government and the Court. In addition to my interview with the defendant, I reviewed the criminal complaint of the presentence investigation, and I also spoke with licensed psychologist Kim Spence, Ph.D., who had conducted a separate assessment of the defendant.

3. Before the interview began, I explained to the defendant that I was not there to see him for treatment, but instead, for an evaluation requested by his attorney. I added that whatever I was told, it was not confidential, but rather it would appear in a written report which would be sent directly and only to his attorney. He and his attorney would in turn decide whether the report would be released to any third parties, such as the Government, the Court, the Probation Office, or other examiners, or whether I would be asked to testify at a future hearing.

**Criminal Complaint**

4. The criminal complaint states that in July 2020, the FBI was made aware of social media activity in which Robert McDougal was making online threats to a specific individual residing in the Middle District of Florida, along with threats toward the individual's family. The individual was

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 2 of 10

identified as a surgeon, who had earlier performed surgery upon McDougal. Following the surgical procedure, McDougal reportedly made threatening online videos and posts directed at the surgeon, for what McDougal considered to be an unnecessary surgery with complications. McDougal was accused of making multiple posts through March 2024, threatening to harm the victim and the victim's family. McDougal was accused of making at least one threatening phone call to the victim's medical practice.

5.  The criminal complaint describes in detail specific threats made by McDougal, including such things as murdering and cutting off the limbs of all family members, and causing suffering to the doctor's children. He also reportedly posted a video expressing his wish to decapitate the physician, cutting off the doctor's hands and limbs, and skinning the head of his wife while still alive. In the post of March 2024, entitled "how my large intestine was stolen," Mr. McDougal stated that he would never stop coming from the doctor, while expressing a desire to genocide his family and wanting the doctor to be tortured, skinned alive, and mutilated.

**Presentence Investigation**

6.  The presentence investigation states that on July 9, 2024, a federal grand jury in the Middle District of Florida returned a four-count indictment naming Robert McDougal as the defendant. The charges involve one count of stalking, and three counts of threat to injure. The document describes at length the offense conduct, as well as additional threats made by the defendant. It was noted that on January 28, 2021, McDougal was served with a stalking injunction effective until January 22, 2026, ordering McDougal to have no contact with the victim.

7.  The defendant was arrested and detained by federal authorities in Seattle, Washington on May 2, 2024. The defendant has since pleaded guilty to the charges, and he is awaiting sentencing in Federal Court in Tampa.

8.  Under the section of victim impact, investigation revealed that McDougal's course of conduct placed the victim's family in serious fear of harm, and caused them significant emotional distress. The victim and his family made lifestyle changes and enhanced their security out of fear of McDougal, and they were cautious when attending their children's extracurricular activities.

9.  The defendant reportedly declined to comment on acceptance of responsibility, other than the statement of facts and the admission of guilt he made at the plea hearing. A calculation of the total offense level equated to 19 points. The defendant's criminal history was described at length within the document, resulting in a sub-total criminal history score of five, a total criminal history score of four, and per the sentencing guidelines, this equated to a criminal history category of III. The minimum term of imprisonment was one year, with the maximum term of 10 years for count one, and a maximum term of imprisonment of five years for each of the three counts of threat to injure. Based on the total offense level of 19 and a criminal history category of III, the guideline imprisonment range was calculated as 37 months to 46 months.

10.  The presentence investigation described the defendant's personal and family data. The defendant was noted to have a history of either Crohn's disease and ulcerative colitis, both of which are inflammatory bowel diseases. The defendant underwent abdominal surgery in February 2020,

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 3 of 10

with the removal of his large intestine and rectum; the surgery was performed by the physician who later became the victim of the defendant's stalking and threatening behavior for which the defendant has been criminally charged.

11. The presentence investigation states the defendant has been given many psychiatric diagnoses over the years, including oppositional defiant disorder, obsessive-compulsive disorder, attention deficit hyperactivity disorder, posttraumatic stress disorder, schizoaffective disorder, and Asperger's/autism spectrum disorder. The defendant was described by his mother as having a history within the autism spectrum, describing him as highly intelligent, but with compulsions that he has no control over. There was reference to a single psychiatric hospitalization in Tampa through a law enforcement Baker Act, although no further details were provided, other than he eloped from the hospital and was returned by law enforcement. There were no concerns raised about substance use disorders.

12. The probation officer authoring the document did not identify any factors which would warrant a departure from the applicable sentencing guideline range. However, the probation office identified the defendant's mental and emotional health concerns as a factor for the Court's consideration in determining whether a sentence above or below the advisory guideline range is warranted.

**Interview with Robert McDougal, October 1, 2025**

Social History

13. Robert McDougal is a 29-year-old white man, born November 21, 1995, in Newport Beach, California. He was raised by his parents, Christopher McDougal and Marla McClain. His father is a retired emergency physician, while his mother is still working as a registered nurse. His parents married in 1982, are still married to each other, and reside in California. Mr. McDougal has no full siblings, but he has two paternal half-brothers he did not grow up with. He spent the first six years of his life in Newport Beach, and spent the rest of his childhood and adolescence in Costa Mesa, California. He graduated from Corona Del Mar High School in 2014. He described himself as making A's and B's his first two years of high school, but due to a lack of effort, his grades were lower his junior and senior year. He graduated high school on time, and he never repeated a grade or required special education services. He acquired some college credits, but he does not have a college degree.

14. Mr. McDougal did some construction work at the age of 19, and in his early 20s he worked in fast food restaurants and as a security guard at a skating rink. He has not worked since the age of 22, and he has been placed on Social Security disability due to diagnoses of ulcerative colitis, schizophrenia, and autism. He never served in the military.

15. He is single, never married, and he has fathered no children. Prior to his arrest, he was living by himself in Seattle. He supported himself on disability income, and financial support from his parents. He was taken into custody in May 2024, and he has been continuously incarcerated since that time.

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 4 of 10

Medical History

16.    Mr. McDougal is not currently taking any medications at the jail. He is uncertain as to any allergies, noting he is possibly allergic to penicillin and sulfa drugs.

17.    Medically he suffered from inflammatory bowel disease, either Ulcerative Colitis or Crohn's disease, diagnosed in July 2012. In 2020 he underwent the removal of his large intestine and rectum in a surgical procedure at the Medical Center of Trinity. He has an ilio-anal anastomosis, and a J pouch. An ileostomy was in place for nine months after the original surgery, and he then underwent additional surgery at Cedars-Sinai Hospital in California to reverse the ileostomy and alleviate post-surgical adhesions.

Substance Use History

18.    Mr. McDougal described himself as only a rare cigarette smoker, not on any sort of daily or regular basis. He denied using vaping devices, and he denied chewing or dipping tobacco. He denied any regular use of tobacco or nicotine products in any form.

19.    He described himself as no more than an occasional user of alcohol, perhaps a single glass of wine or single cocktail once a week. He denied any history of daily drinking, morning drinking, tolerance to alcohol, alcohol withdrawal symptoms, alcoholic blackouts, craving alcohol, often drinking more than intended, or failed efforts to quit or cut down on drinking. He denied that alcohol use ever resulted in violent behavior, he denied driving while under the influence of alcohol, he denied any alcohol related arrests. He denied that alcohol use ever resulted in medical, legal, or family problems.

20.    He reported trying marijuana earlier in his life, but never on a heavy or regular basis, and he has not used any cannabis products since 2017. He has never obtained a medical cannabis card. He denied the use of synthetic cannabinoids such as K2, spice, or Delta 8.

21.    He denied ever using powder cocaine, crack cocaine, heroin, fentanyl, intravenous drugs, ecstasy, molly, or crystal methamphetamine. He denied the use of hallucinogens such as LSD, hallucinogenic mushrooms, ketamine, PCP, DMT, or dextromethorphan. He denied the use of inhalants such as duster, nitrous oxide, or amyl nitrate.

22.    He has never used anabolic steroids. He denied the misuse of prescription sedatives, opioids, and stimulants.

23.    He has never attended a drug or alcohol rehabilitation program, not outpatient, intensive outpatient, partial hospital, or residential. He has never gone through a detoxification procedure, and he has never attended a 12-step group such as Narcotics Anonymous or Alcoholics Anonymous.

Prior Criminal History

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 5 of 10

24. Mr. McDougal's previous involvement with the criminal justice system is described at length within the presentence investigation.

Psychiatric History

25. Mr. McDougal reported two lifetime psychiatric hospitalizations. In June 2020 he was hospitalized by the Baker Act shortly after undergoing abdominal surgery. He described postsurgical complications including infections, poorly healing wounds, and chronic pain. He was using Percocet for pain, and his mother was concerned that he was suicidal, although he denied any active intent to kill himself. He was brought to the hospital on a Baker Act, and he recalled walking out of the hospital, although being brought back to the facility by police. He was discharged from the hospital after a three-day stay.

26. The other inpatient hospitalization took place in April 2017, at St. Joseph's Hospital in Santa Ana, California. He reportedly made threats online about people in a bar who were cheering when security guards manhandled him. He was driven by law enforcement to the hospital, and he remained there for three days.

27. Mr. McDougal denied any history of suicide attempts. He denied any history of self-injurious behavior, and he denied any history of aborted or interrupted suicide attempts. He denied any history of preparations to end his life, such as writing a suicide note, giving away his belongings, or stockpiling medications. He described himself as "very focused on self-preservation."

28. Mr. McDougal said he had been primarily diagnosed as suffering from either schizophrenia or being on the autism spectrum. However, I did not obtain a history for hallucinations, delusions, or other psychotic symptoms; the presence of such psychotic symptoms would be required in order for a diagnosis of schizophrenia to apply. He denied any history of auditory, visual, tactile, or olfactory hallucinations. He denied any history of paranoid, grandiose, religious, or referential delusions. He did not present with any obvious disturbance in the flow of thought. Mr. McDougal denied any recent and remote history of psychotic symptoms, which would suggest he would not be criteria for a diagnosis of a psychotic illness such as schizophrenia.

29. Mr. McDougal noted he was first suspected as being on the autism spectrum as early as grade school. He described a long history of trouble making friends, difficulty establishing peer relationships, and being bullied and picked on by his peers. He described difficulty in understanding body language, and in interpreting the facial expressions of others. He noted it is difficult for him to understand the motives and rationale of others. He denied an insistence upon sameness, denying any rituals, and he denied any history of taking things apart. However, he described an unusual interest in the Trinity at the minutiae of movies, while also spending a great deal of time thinking about the aspect ratio of movies (the height and width of the production), spending a great deal of time and effort thinking about this aspect of moviemaking.

30. He did not relate a history of manic or hypomanic episodes, denying episodes characterized by elation, euphoria, grandiosity, pressured speech, irritability, racing thoughts, markedly increased energy, a decreased need for sleep, motor restlessness, or reckless spending; he did not relate a history suggestive of an illness within the bipolar spectrum. While he reported some sense of

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 6 of 10

nervousness over his current legal predicament, he did not describe a history of major depressive episodes, denying episodes characterized by at least two weeks of intense sadness, hopelessness, worthlessness, suicidal thinking, or marked changes in sleep, appetite, and energy.

Mental Status Examination

31. Mental status examination revealed a white man, perhaps 5'10" tall and 140 pounds, wearing glasses, with a goatee, and dressed in a jail uniform. He was generally cooperative and pleasant throughout our assessment. His speech was somewhat rapid and digressive, with a tendency to run on and engage in long soliloquies when I did not interrupt or redirect him. Motor behavior was normal, without restlessness, tremor, or involuntary movements. His flow of thought was somewhat overly detailed, with a tendency to run on in his speech, but I had no difficulty redirecting him back to the topic at hand.

32. He denied auditory, visual, and tactile hallucinations. He denied paranoid, grandiose, referential, and religious delusions. He did not express the belief that there were any plots or conspiracies against him, and he did not believe that he was in any current danger of harm.

33. He denied suicidal or violent ideas, denying any wish to be dead, and denying any wish to go to sleep and never wake up. He denied any recent or remote self-injurious behavior, or aborted or interrupted suicide attempts. He denied any recent or remote preparations to end his life, such as writing a suicide note, giving away his belongings, stockpiling medications, hiding a sharp object within his cell. He denied any thoughts of violence towards others.

34. He described his mood as somewhat nervous about the upcoming sentencing. He understands the guidelines sentences 37 to 46 months, but he understands the Judge has wide discretion, and he could end up with anything from "going home to 25 years." He denied any feelings of hopelessness or worthlessness, and he did not present as agitated or irritable. There were no symptoms of manic acceleration such as elation, euphoria, irritability, grandiosity, pressured speech, motor restlessness, or markedly increased energy. He was fully oriented to person, place, and time, and recent and remote memory was intact. Intellect was at least in the average range, and possibly above average.

Current Offense

35. Mr. McDougal listed the name of the surgeon who is the alleged victim in this matter, noting the surgery was performed in 2020. Mr. McDougal stated, "the surgery should not have been done. There were many complications, a lot of pain, persisting deficits, and disfigurement. I want what happened to be reversed, I hope science will advance to regrowing colons, we are not there yet, and probably not in the immediate future." The defendant then launched into a discussion on biotechnology and antiaging therapies, and the hope that someday technology would advance to where his colon could be replaced.

36. Mr. McDougal described having a lot of bitterness, and still feeling rage towards the surgeon, although this has led to the detriment of his being locked up in jail. He added, "I didn't think posting an article would count as direct contact, I didn't think it would be seen. Obviously, I

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 7 of 10

didn't mean to carry it out, I was 2000 miles away. I didn't think the intent was to intimidate or harass him, it wasn't sent to the doctor, I wasn't sure that it was illegal. It was probably not seen by anyone in Florida, I know I didn't mean it."

37. However, when I asked Mr. McDougal what impact he believes his actions might have had on the family, his response was "emotional stress would be good, the doctor is a cold-blooded psychopath." I asked again if he thought his messages would cause distress to the doctor and his family, and the response was, "I wasn't thinking he'd see. I didn't care about his stress, the emotional stress he put me in is a thousand times greater." Asked if this might have caused any emotional impact on the surgeon's wife and children, Mr. McDougal responded, "I was just venting, I wasn't thinking about that."

38. Mr. McDougal stated that the surgery robbed him of future romantic relationships and sexual partners. When asked to explain, he said that the "scar tissue messed me up," stating "I'm upset about the scores, it's hard for me to have sex, I just focus on the disfigurement." He explained that he has never had a steady girlfriend, although he has had some encounters with escorts, that he was hopeful of having a relationship in the future. He believes that his scars are so awful looking, and he would be so focused on it if he were undressed with a woman, that he would not be able to perform sexually. He added that attempts at sex had been painful and uncomfortable after surgery, both due to the surgical procedure and the impact of the scarring.

39. I then asked Mr. McDougal about the likelihood he would return to the behavior that caused him to be arrested on these charges, whenever the Court allows him to be released from incarceration. He responded in an understanding "that any and all measures would be deployed to extradite me if I do this again." He was aware that further arrest on these charges could "result in me receiving decades in prison just for words."

40. I asked Mr. McDougal if the threats that he made were in his mind justified. He denied being a vigilante, and said that the comments and threats were made when he was in a lot of pain. Asked about the most recent statements made in 2024, Mr. McDougal said he was focused on the physical and emotional harm done to him, while adding that he "should have been more careful."

41. He reiterated he had no actual intent, plans, or preparations to inflict physical harm on the doctor or his family. He said the statements were made out of rage, wanting his colon to come back, to have the disfiguring scar tissue removed, and he was "venting rage, without any intention of carrying out."

42. While Mr. McDougal said he felt bad for the doctor's wife, he reported little sympathy for the doctor, saying that the doctor lied, took his organ, and made his life miserable, and he hopes the doctor thinks about what he did.

**Telephone Discussion with Kim Spence, PhD**

43. I spoke by telephone with Doctor Spence for about 30 minutes on October 22, 2025. (Doctor Spence is a licensed psychologist and academician with particular expertise in the diagnosis and

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 8 of 10

treatment of autism spectrum disorders.) She had conducted an assessment of Mr. McDougal independent of my assessment of the defendant.

44. Doctor Spence opined that Mr. McDougal met the diagnostic criteria for autism spectrum disorder, with persistent deficits in social communication and social interactions, along with restricted and repetitive patterns of behavior, interests, and activities, which dated back to the developmental phase of his life. The autism spectrum disorder did not involve accompanying intellectual or language impairments. Doctor Spence also noted there were unusual aspects in the defendant's upbringing and family dynamics, which may have also contributed to the defendant's later psychiatric and psychological difficulties.

45. Doctor Spence noted the defendant had a driven and obsessional quality to his focus on the surgeon, bordering on delusional thinking. She described him as falling in the "resentful stalker category," with a high risk for the recurrence of the stalking behavior. Treatment recommendations included relationship and social skills training, such as through behavioral analysis and cognitive behavioral therapy, and consideration of psychiatric medicines to address obsessional thinking and behaviors.

**Diagnosis**

- Autism Spectrum Disorder, without language or intellectual impairment

**Discussion and Opinions**

46. I was asked to conduct a psychiatric evaluation of Robert McDougal, a 29-year-old man who has pled guilty in Federal Court to charges of stalking and threats to injure, with his sentencing upcoming in Federal Court in Tampa. I was asked to opine as to psychiatric diagnosis, treatment recommendations, and any potential mitigating factors which might be worthy of consideration by the Government and Court.

47. Mr. McDougal, in my opinion, would meet criteria for autism spectrum disorder, consistent with the diagnostic opinion reached by Doctor Spence. There is a history dating back to childhood of marked deficits in social communication and social interaction, along with restricted and repetitive patterns of behavior, interests, and activities. He has received very little in the way of psychiatric and psychological treatment over the course of his life.

48. Autism Spectrum Disorders are considered to be the result of a neurologic disorder that affects the functioning of the brain. The core characteristics are persistent deficits in social communication and social interaction across multiple contexts, along with restricted and repetitive patterns of behavior, interests, and activities. Individuals with autism spectrum disorders do not see or comprehend crucial social cues which neurotypical individuals depend on to assess and adapt to social situations. Some authors have considered individuals with these disorders to suffer from "mind blindness," unable to perceive other's needs, desires, or distress, due to their inability to interpret other people's behavior in the correct fashion. These individuals are many years behind their neurotypical peers in social and emotional development. They fail to respond to nonverbal cues in social settings, and do not seem to grasp or appreciate unwritten

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 9 of 10

rules of social engagement, viewing everything in a concrete fashion. In addition, autism spectrum disorders are characterized by restricted, repetitive, and stereotyped patterns of behavior, with narrow focus on very specific activities.

49.  An individual with an Autism Spectrum Disorder may sometimes engage in what can objectively be viewed as criminal or antisocial behavior, while lacking any subjective understanding or appreciation whatsoever of its impropriety or criminality. Their difficulty in associating actions with their results, and their inability to assess social situations and appreciate the point of views of others, constitutes a major factor in criminal accusations against individuals with autism spectrum disorders.

50.  I am not of the opinion that Mr. McDougal would meet the strict criteria for insanity as defined in the Federal Statutes. While Mr. McDougal was (in my opinion) suffering from the severe psychiatric/neurological disorder of autism, he nevertheless had the capacity to appreciate that his conduct was wrongful and a violation of the law.

51.  However, it is my opinion that through the prism of his autistic mindset, he was suffering from a significantly reduced mental capacity due to his long-standing developmental illness. While still able to recognize the conduct was wrongful, and falling short of the insanity criteria, it is my opinion the significantly reduced mental capacity contributed substantially to the commission of the offense. In the context of his rigid autistic thinking, he believed himself to be so victimized by the surgeon that he justified his actions in making the threats. He justified his actions in part by his intention to never physically carry out the physical threat. Further, while he acknowledged that the threats could cause distress to the surgeon, his mind blindness, and inability to emotionally comprehend the emotions and thoughts of others due to the autism, rendered him unable to appreciate how severely the threats were perceived by the surgeon, and the extreme distress and fright his actions caused to the surgeon and the surgeon's family. Essentially, in the context of his autism spectrum disorder, his ability to understand the extreme distress and emotional harm he was causing to others was, in my opinion, substantially impaired, and contributed to the commission of the offense, allowing him to provide a distorted sense of justification for the behavior.

52.  It is my opinion that whenever this defendant is allowed to be released from incarceration, he would benefit from intensive treatment designed for an individual with autism spectrum disorder. Such treatment could involve relationship and social skills training, behavioral analysis, cognitive behavioral therapy, and referral to a psychiatrist for consideration of pharmacotherapy.

53.  Overall, it is my opinion the defendant suffers from a significant mental illness, an autism spectrum disorder, and his altered thinking and mindset due to this illness contributed in a substantial way to the behavior for which he has been charged and is about to be sentenced. The Court might choose to consider this as one factor, among others, in determining the sentence and disposition of Mr. McDougal.

54.  The above opinions are to a reasonable degree of medical certainty.

Respectfully submitted,

Bjorn Brunvand, Esq.
Re: Robert Bouton McDougal
Page 10 of 10

Jeffrey A. Danziger, M. D.